SOVEREIGN CAMP, WOODMEN OF THE WORLD, v. LENHARD et al.

(No. 6250.)

(Court of Civil Appeals of Texas. San Antonio. Oct. 15, 1919. Rehearing Denied Nov. 19, 1919.)

1. INSURANCE ☞819(2)—SELLING OF LIQUOR IN VIOLATION OF LIFE POLICY.

In an action on a fraternal order's life policy, evidence *held* to show that insured sold liquor in violation of a clause of · his policy every day for nearly three months, and that such selling was part of a service for which he was employed by a saloon keeper.

2. INSURANCE ☞748—SELLING LIQUORS IN VIOLATION OF LIFE POLICY.

Where a fraternal order's life policy provided that persons engaged in the business of selling malt or intoxicating liquors should not be admitted, and that the certificate of any member who should engage in any prohibited occupation should become void except on notice and payment of an additional assessment, and insured, without notice or payment of the additional assessment, engaged for three months in the business of selling intoxicants, his beneficiaries cánnot recover on his death.

Appeal from District Court, Gonzales County; M. Kennon, Judge.

Suit by Mrs. Frank Lenhard and husband against ·the Sovereign Camp, Woodmen of the World. Judgment for plaintiffs, and defendant appeals. Reversed and rendered.

E. D. Henry, Perry S. Robertson, and Atlas Jones, all of San Antonio, for appellant.·

W.· B. Green and W. H. Blanton, both of Gonzales, for appellees.

FLY, C. J. This is a suit for $3,000, instituted by Etta Lenhard and her husband, Frank Lenhard, against appellant, based on a policy of insurance, issued by appellant to William Ronshausen, an uncle of Mrs. Lenhard, the latter being the beneficiary named in such policy. It was alleged that William Ronshausen died on February 2, 1918, and that all premiums on said policy had been fully paid and all conditions complied with. As a defense, appellant pleaded a forfeiture of the policy by an infringement on the part of William Ronshausen of the following section in the policy:

"Sec. 42. Persons engaged in the following classes of business or employment shall not be admitted:

"(A) Those employed in any department of ammunition factories where explosive compounds are made or handled, balloonists, aviators, aeronauts, aeroplanists, plow grinders, sandstone cutters, grindstone turners, professional gamblers, saloon keepers, bartenders or those engaged in retailing of intoxicating liquors as a beverage; automobile· drivers and mechanicians in races, automobile speed testers, motorcycle riders in races, high divers into netting or into water, professional contortionists, marine divers, submarine divers, fireworks makers, horse jockeys and oil or gas well shooters; also persons employed in the making, compounding, distilling, rectifying or brewing of malt, spirituous, vinous or intoxicating liquors, or in the distribution or delivery of the same. '

"(B) The beneficiary certificate of a member who shall engage in any prohibited occupation shall thereby become null and void unless such member shall within thirty days after engaging in such prohibited occupation notify the clerk of his camp, in writing, of such change of occupation, and thereafter, while so engaged, pay an additional sum of fifty cents on each monthly installment of assessment for each one thousand dollars of his beneficiary certificate, or six dollars additional per annum on each one thousand dollars of his beneficiáry certificate."

[1, 2] The cause was submitted to a jury on the following issue, and no other:

"Was the deceased, William Ronshausen, engaged in the occupation either .of saloon keeper, or as a bartender engaged in retailing intoxicating liquors at any time during the months of October, November or December, 1917?"

The question was answered by the jury, in the negative, and upon that answer judgment was rendered in favor of appellees for $3,000, less a credit of $29.80, with interest at six per cent., from June 19, 1918, the date of the filing of the suit.

By the claim made, through the medium of the first assignment of error, of. the insufficiency of the evidence to sustain the verdict of the jury, a review of the testimony on the question submitted in the special issue is necessitated. On April 4, 1894, William Ronshausen, who was at the time engaged in the grocery business in Gonzales, Tex., applied for and obtained a certificate of insurance from appellant for $3,000, stating in his application that he was not a saloon keeper or bartender, but was a groceryman. Mrs. Lenhard, at the time Etta Ronshausen, being a niece of the insured, was named as the beneficiary. The insured afterwards became a farmer and moved to Oklahoma. In September, 1917, the insured was employed by Henry Himel, a retail liquor dealer in Ft. Worth, and worked for him for nearly three months. Himel testified:

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"I paid him $10 a week. He was porter and lunch man in said saloon. He cleaned up the closet.. It was not customary for a bartender to clean up a closet. He was not employed as a bartender. He served drinks over the bar. He did this only occasionally. I would list him as porter rather than bartender if I was classing him. * * * Ronshausen began work in my saloon in Ft. Worth, Tex., about October 1, 1917, and he worked up to the night of December 25th. He swept out the saloon and served lunches and washed glasses. During the time he worked for me I had a regular bartender by the name of Fred Stupe. Myself and Stupe were the regular bartenders. I came on about 6 o'clock in the morning, and stayed all day. Stupe came on about 10:30 a. m. and stayed on until about 9:30 p. m. Ronshausen began work about 6 o'clock each day. He would go to the saloon about that time and sweep up, and I would come on about the time he did and open up. Sometimes he would open up. He always had a key to the saloon. He would stay on from about 6 a. m. to noon, and then come on about 4 p. m. and stay until about 6 p. m. When I went out of the saloon of mornings, before Stupe came on, for the purpose of buying such things as meat for the lunch counter, I would leave Ronshausen alone in charge of the saloon, and he would run the same while I was out, and this was the course of business during October, November, and up to December 25th. When there was a rush of business Ronshausen would assist me and Stupe in selling liquors, and this was the course of business during October, November, and up to December 25th. Ronshausen sold liquors for me at retail to be drunk in the saloon or taken away as the customer liked. * * * When there was a rush and Ronshausen assisted me and Stupe in selling liquors, he would sell to the customers just as Stupe and I did. He sold liquors over the bar, and he served lunches over the bar. I had only one room, and the lunches were served over the bar and over the counter. They were kept in a show case. The lunches were sold, either alone or with drinks, as the customer desired. On the night of December 25th Stupe had come home early, and then I went home and left Ronshausen in charge of the saloon and to close up, and he closed up the saloon about 9:30 p. m. and started home, when he was struck by the negro near his room. He had my saloon key in his pocket."

The witness testified that Ronshausen never worked any more after he was hurt, but died from the effects of his wound on or about January 19, 1918. Himel, in response to a question as to whether Ronshausen acted as bartender for him in his saloon and sold intoxicating liquors as a beverage at retail, answered:

"Yes. Whenever the business was so that he was needed, he stepped in and helped me as bartender, selling liquors for me when we were crowded with business. I had two men. Ronshausen acted as bartender for me when I was absent."

Among the prohibited business and employment in section A, division C, of appellant's constitution were those of saloon keeper and bartender. In section 42 of the constitution it is provided that saloon keepers, bartenders or "those engaged in the retailing of intoxicating liquors as a beverage" shall not be admitted to the insurance organization, and we think the testimony not only shows that William Ronshausen was a bartender during the months of October, November, and December, 1917, but was actively "engaged in the retailing of intoxicating liquors as a beverage." The last work he performed before he was struck by the negro on the night of December 25, 1917, was tending bar and closing the saloon for his employer.

The language of the constitution and by-laws of the fraternal insurance company clearly condemns the sale of intoxicating liquors, whether at wholesale or retail, and whether as a vocation or an avocation. It is not provided that in order to come within the provisions of the law the insured should do nothing else but sell liquor, nor is it provided that a man could not be a bartender who swept the saloon, washed dishes, and sold lunches, in addition to selling liquor. It was clearly within the scope of his employment for Ronshausen to sell intoxicants every morning while his employer was out marketing and when there was a rush. His duties were as well defined as to selling liquor as to washing glasses or dispensing food, or sweeping the floor. His employer said, "this was the course of business during October, November, and up to December 25th." Calling him porter did not destroy the fact that a part of the duties of his general employment was to sell intoxicating liquors every day.

The Texas cases and the New York case cited by appellees have no applicability to the facts in this case. In the case of Guiltinan v. Insurance Co., 69 Vt. 469, 38 Atl. 315, cited by appellees, the evidence was doubtful as to whether the servant had ever sold liquor, and it was unquestioned that he was not employed to sell liquors and had no authority to do so. The facts are very different from the facts of this case, which show that the insured sold liquor every day for nearly three months, and that it was a part of the service for which he was employed. The Vermont court held that it was a disputed point as to whether the insured ever sold any liquor, and was a matter to be decided by a jury. The court also approved an instruction given by the trial court to the effect that if the servant "was employed in that house generally to do what he was called upon to do from day to day, and as a part of that general employment he sold alcoholic beverages to the guests as they called for them, he was engaged in the sale of alcoholic beverages, within the meaning of the contract; but, on the other hand, if this was no part of his general business

or employment, even though he did occasionally, out of his ordinary line of duties, by direction of his employer, or otherwise, furnish the guests with intoxicating liquors, and take pay for them, he was not engaged in such sale, within the meaning of the contract." It was .according to the evidence a part of the general employment of Ronshausen to sell intoxicating liquors every day, and he did so sell them. It was not an occasional sale, any more than an occasional sale of food or washing of glasses. It "was the course of business." On every Saturday night for nearly three months Ronshausen remained in the saloon until 9:30 p. m. selling liquors, just as did his employer and the other bartender. Himel swore positively that he had two men in his saloon, and that Ronshausen acted as bartender when his employer was absent. The evidence brings Ronshausen clearly within the purview of the contract. It is not pretended that he gave notice of his employment in the saloon, or paid the increased assessment arising from such employment.

The case seems to have been fully developed, and because the verdict is clearly contrary to all of the evidence, the judgment is reversed, and it is the judgment of this court that appellees take nothing by their suit, and pay all costs in this behalf expended in this and the lower court. .

Reversed and rendered.

MOURSUND, J., not sitting in this case.

⬤➝For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes